For this morning, this is Vansky v. City of Vandalia, number 517-0418. Down before the appellant, you may be seated. Good morning, your honors. Counsel. My name is William Hardy. Along with my full counsel, Chuck Pierce, who was the trial counsel in this case, I appear on behalf of the defendant appellant, City of Vandalia. Your honors, this case involved a terrible tragedy. Nobody disputes that. Nobody in this room, nobody in the village of the City of Vandalia has anything but sympathy for what occurred in this case. But that's not what's before the court. What's before the court are two certified questions. And the first certified question deals with whether the city is immune to the allegations of the complaint under various provisions of the Tort Immunity Act. And the second certified question addresses the issue of whether the city had a duty. Now, I intend to concentrate today on a couple of points with respect to the immunity. I'd like to concentrate primarily on Section 4-102 of the Tort Immunity Act and a little more discussion of the Dockery case because I think that is dispositive of the negligence and willful and wanton counts in this case. And I think we'll probably rely on a brief for most of the other immunity provisions, but if the court has any questions, I'd be happy to answer them. And secondly, I'd like to spend some time talking about the duty issues. So first, Section 4-102, immunity. Before I get to that, let me just say something about this allegation that we own the railroad. We have several counts here. We have two counts, Commonwealth counts. Count 8, I think it's Count 9. Count 8 is the negligence count. Count 9 is the willful and wanton count. Or maybe it's a different count for the willful and wanton. And then there are a number of counts where we are lumped into this railroad group and it's alleged that we have certain duties under federal law as a railroad. And the plaintiff's counsel criticizes us for at one point going beyond the record and actually citing a deposition that he established and argued without any question at all that all the traffic in the 6th Street crossing is owned by the railroad. But I recognize that the complaint alleges otherwise. So I'm not expecting the court to decide any factual issues here. I want to make that very clear. But the two counts that relate to negligence and willful and wanton, those don't have anything to do with that. So I think at the minimum, this court should decide the certified questions as to those issues. If it's a question of whether or not we own the railroad and therefore a railroad or we are a railroad, then that's a simple remand matter, and we think we can prove without any question at all. Is there a difference between owning the railroad and being a railroad? I was kind of thrown by that. Well, yeah. I mean, I'm not an expert on railroad law. I've reviewed the cases here. But, you know, I mean, in this case, you certainly could have the city that owned certain track, and there is an indication that they own certain spur track, not within this intersection but outside of the intersection. But, you know, that doesn't mean that they have obligations as a railroad. Obviously, the railroad handles its own trains. You know, it has the schedules. It has everything else, which I think is the reason why you have the ICC that makes these decisions and approves these kinds of configurations, and in this case approved an agreement whereby CSX, then Conrail, would maintain this entire area within this 6th Street configuration. So let me begin with the agenda of Section 4-102. There are many cases dealing with Section 4-102. But the case that we think is most on point is the Dockery case. And, Justice Chapman, I noticed that you were on that panel. You were a concurrent justice in that case. It happened in 1990, so I don't expect you to remember it. I can't remember. 1990? I think it was 1990. That would not be the same person. It would be Justice Charles Chapman. Okay. Well, I apologize for it. That's okay. I didn't mean to date you. You just handed 10 years to me. I apologize for it. You're not the first one, Mr. Hardy, to presume that. It's understandable. Okay. So, in any event, the allegations of the complaint relating to the negligence and the low-flowing water relate to the way the city managed the police functions of this parade, the way they directed traffic. They closed off the parade route itself. There's no question about it. And they had people manning that parade route. This happens at parades every day. I mean, whenever they have parades. And the allegations are that because of the way this was closed off, it increased congestion at all of these other intersections, including the 6th Street crossing. Now, Plaintiffs' Counsel tries to bring this case into an exception, which they think is an exception based on Dockery, which is where the court said, look, there's no allegation of any affirmative act. They specifically directed somebody to an area of danger. Well, our position is there's no allegation of that in this case. You look at the complaint itself, and it's very clear, although they try to stretch this by, I think, just plain misrepresenting what the discovery deposition of the police chief said. I mean, there was nobody present at this particular intersection. They had someone present on the parade route, which is 300 feet of football field south of where this accident occurred. But the bottom line is the allegations relate to the alleged failure to provide adequate police protection with respect to traffic congestion, planning the parade, having people around at different locations and whatnot. And also alerting the railroad, correct? And also alerting the railroad. They make an allegation that, well, look, the year after this, we notified the railroad. Well, first of all, I mean, that's not going to come into evidence anyway. That would be a subject of remedial measure. But even that, there's no obligation to contact the railroad every time there's some of that. And that, I think, would be a police function as well. So what we're talking about here falls fairly – falls squarely within the Dockery case, as far as I'm concerned, in Section 4-102. So our position is that, look, the court ought to end this now on the negligent Wilflin-Watton counts. And on the Wilflin-Watton plaintiff's counsel, it includes an argument that there was – Wilflin-Watton was counted for the very reason that you suggest, that, well, someone suggested, allegedly, that they contact the railroad and they didn't do it. Well, we pointed out the cases. There are two or three cases, the Smith case and, I think, the Enright flood litigation case, Supreme Court cases, which very clearly say 4-102 and several other provisions that we cite are not – doesn't matter whether it's Wilflin-Watton. It's blanket immunity, period. And he doesn't try to distinguish those cases. So in our view, those two counts are out. Now, on the duty issue, here's another interesting thing. Plaintiff's counsel really does not address any of the cases that we cite. The allegations of the complaint are very clear about what happened here. In 1984, this was changed. The configuration was changed. There were ICC hearings, no question about that. There was a mainline track originally and then a siding track. The siding track was taken out. There was a spur track that went off instead of being a siding track. And this entire configuration was approved by the ICC. And under that, those proceedings, plaintiff's counsel alleges this right in the complaint. If you look at this map, which is on page 7 of our brief, for illustrative purposes, I mean, it's basically the same as the one that they include in their complaint, but it was very difficult to see with a black-and-white copy. But in paragraph 58 of their complaint, they allege that Conrail is responsible for maintenance of the track south of the northerly boundary of Main Street. Now, so the northerly boundary of Main Street is the top there, okay? And then everything south of that, and by the way, a crystal anvil is coming from the top and through that intersection when this accident occurred. So her counsel, did she pull onto that spur and then understand that it was undisputed? The allegation is that she pulled forward onto the mainline from the spur. Well, I don't know if it's undisputed. It's undisputed for the purposes of this appeal because the complaint does allege that. Yes. The complaint alleges that she pulled in and stopped on the spur track, and then the train came. Actually, the complaint alleges that she proceeded into the intersection and had to stop on the spur track because there was traffic in front of her. Then the trains came along and the gates came down, and she was stuck in the middle, and then they have these allegations, which is another thing. I don't know how you can possibly take these as well-pled facts. They say she didn't. They try to allege what's in her mind. Nobody's going to come in and testify to what was in her mind. But the allegation is she was on the spur track, the train started coming, and then she proceeded across the main track and was struck by the CSX train. I mean, those facts are- The suggestion was that she was confused when she knew that there was a train coming and she was parked on the spur track, thinking that was the track the train was going to come onto. And I think in the complaint, the allegation is because of the hump in the road, she didn't even know there was another track in front of her or didn't see it, and that, unfortunately, is where the train actually was on. That is the allegation of the complaint. That's true. We're not disputing that for purposes of this case, of these certified questions. But it's very important for this Court to understand from a duty perspective that the ICC approved this configuration in 1984, and that included, according to Plante's complaint, and I don't think anybody disputes this, that CSX, then Conrail, was responsible for maintaining that area in between. So they're the ones that handled all of that. The elevation of the track, the asphalt, everything is on the railroad. And by the way, the railroad is not on this case. I don't want to sell it as a confidential settlement. It's part of the record. I don't think it's relevant for purposes of this, but it is on file, under seal, in the trial court. But the bottom line is that the cases we cited are very clear on this. We have the Danner case, I think, is the one that's most on point, which is a 4th District case. And there's also this more recent case with, I think, Judge Justice Moore. You were actually the author of the opinion on that, that village of Bell. Bell Rye. Bell Rye, yes. That case is not quite on point because it involved a little different issue. It involved, you know, municipality trying to get a railroad to pay for replacements and bridges and other things. It involved jurisdiction of the ICC. Correct, correct. But you cite the same cases and the same law that's cited in Danner and the Espinoza case and these other cases. And those cases make it very clear that when the ICC approves a particular configuration, in this case, you know, this is a wide area. It's less than 70 feet. You can see it on the 70 feet from center line to center line. I'm not sure. I'd have to look at the complaint. But, I mean, it is a, you can see on page 7 of my brief the configuration where, you know, there's the gates are there on the other side of Main Street on the top, and then on the, then you've got to go all the way down to the bottom past the mainline track. That configuration was approved by the ICC along with the understanding that Conrail, now CSX, would be handling all the maintenance in between that period. And one of the things that they're trying to do here is say, oh, the city knew this was dangerous. The city should have petitioned the ICC. The city should have done this. The city should have done that. These cases, that Dana case, the Espinosa case, the Village of Bellryle case that you were the author on, make it very, very clear that once it's approved, the particular configuration, where these gates are, what the warning devices are, all of that, that is conclusive. And there's no duty, no duty, period, to petition the ICC to change that in some way. There just isn't. It does not exist as a matter of law. But they obviously want to try to impose that duty on us. Now, I should say there's a difference, though, between approving the configuration and the maintenance of the track and maintenance of the area. I mean, if the signals weren't working, if the track had some kind of a defect in it or whatever, that's on the railroad, which is probably why the railroad settled the case. I don't know. I wasn't a part of that. Because the railroad was responsible for all that maintenance. There's no question that the railroad could have been sued for failing to properly maintain all this. And there were allegations that the railroad, you know, they didn't blow the whistle in sufficient time. They didn't warn. There are a number of allegations in there which they tried to lump in with us as railroad defendants, which, again, I think it's going to be very clear, if this is remanded, that it can prove without question that we're not a railroad. So I think those cases are dispositive of that duty issue. And, of course, we also have the general test, you know, foreseeability, the burden of placing the duty on the party, the defendant, the magnitude of that duty, the consequences, so on and so forth. And, you know, I just don't know how you can look at that test, and that's a legal test, and say that the city has some kind of an obligation to prevent this accident. I mean, you know, if that is the case, Your Honors, then we're in a lot of trouble for these municipalities. Because every time we have one of these events, I mean, I remember this solar eclipse that we had in southern Illinois. And my son was an aerospace student at the time. And they drove down and launched some weather balloon somewhere on the other side of Carbondale. And it took them ten hours to get back. Why? Because there was so much traffic congestion. Municipalities all over the place, closed places, a lot of places, people parking places. If the obligation is, I mean, if the law is that, hey, you then have a duty then to take some extra precautions at every railroad crossing. My gosh, we're in a lot of trouble here. And this notion that... But are they suggesting that, or are they, I mean, this may be argument, but are they suggesting that every time that there's anticipated congestion on the roads, that they have a responsibility, that someone has a responsibility to notify the railroad? Or is it more that when the city or the municipality takes the affirmative act of closing a main thoroughfare through the town, knowing that that would cause congestion in other areas, that that was something to put the railroad on notice for when there's a scheduled closing of a main road? Well, those kinds of things happen in football games. Those kinds of things happen in the very example that I gave you where you have municipalities or designated parking places for people who are coming down to look at this solar eclipse. I mean, if the magnitude or the burden, the chilling effect that that would have on municipalities to hold them liable for these things, particularly when you have the ICC that has already approved this thing. Look, I'm not disputing that railroad crossings are dangerous. I mean, all railroad crossings are dangerous. I mean, all intersections you're driving at are dangerous. If we get up in the morning and get in the car or, you know, if we want to live life these days, we want to go to parades, we want to go to these events, we want to go to football games, we want to go to Halloween parades. You know, these are the kinds of things that we need to encourage municipalities. And the Lions Club, the Lions Club got out on a motion to dismiss, and that's final. You know, there was a Rule 304A finding that wasn't appealed. For going to encourage these things, we have to enforce these types of immunity. I'm sorry, does that mean that I'm flashing? Less than that. Okay. So I think the chilling effect would be applying that four-part test, particularly considering all of these cases, simply establishes that there's no duty as a matter of law. I see that I'm out of time. We're just about out of time, so unless the Court has any questions, I will reserve the rest of my time for rebuttal. Thank you, Counselor. You will have an opportunity to pull rebuttal. Thank you, Your Honor. Counsel for Appellee. May it please the Court, good morning. I would agree with Counsel on most of the things that he concerned. Oh, excuse me. Go on. Bob Potroff, on behalf of the plaintiffs, I would agree that most of the reiterations of what we're claiming are probably not viable due to the immunity of the city. But those aren't our claims. Those are the claims that they are reiterating and rephrasing from our claims. Our claims are very simple. If the city would have simply issued the permit, it has total immunity for issuing a permit under 2-104 and said, Lions Club, go put this together. Lions Club would then have to do it correctly. That's not what the city did. The city issued the permit and contemporaneously issued a resolution that says we accept full responsibility for anything relating to this particular accident. They don't have to do that. What they just did is assume that they now have to do this correctly. That is the first departure off of what their immunity would provide if the city were to simply, and the city is relying on 2-104 in their brief. They talk about 2-104, and we're not suggesting they shouldn't issue the permit. Go ahead and issue the permit. Don't then tell Lions Club they're off the hook because that would go back up and violate 4-102, which says this immunity cannot be transferred to someone else. And in essence, what they did is transfer their immunity to Lions Club, who got out on a motion to dismiss based upon the city having assumed full responsibility. Now, given that, the question comes up, should the city know? And we had to ask the court, since this was a 2-619, that we could supplement the record with additional discovery. We did the additional discovery, supplemented the record. Since this is an affirmative defense that's brought by the city, they had the duty to bring whatever other factual allegations were necessary to support their affirmative defense, and we countered that with the additional record. Now, the simple explanation is the city knew, and from the resident, from the NTSB, from if they watched television and saw the Veterans Day parade in Midland, Texas, where after that parade was over, a couple blocks from the end of the parade, they were running people off and causing congestion at a railroad crossing, and a float after the parade was over got hit by a train. And NTSB sent the city of Vandalia and the state of Illinois. And advised me, you need to make sure you plan these events, and in any events where you're going to do congestion like this, you need to call the railroad. The city knew they were supposed to call the railroad. One of the reasons the railroad is out of this case is the railroad then came in and provided the record for us that we had given them the phone number to call us. We had opened the line of communication with the city. In fact, here's all the other calls we got from the city, including tree limbs down, some guys walking on the railroad. A number of calls were made, so the railroad became, if you will, a support mechanism for the claims against the city by showing this isn't. And if you go back to the Burns v. Centralia case and look at the four factors determining whether or not there's a duty, the one that is a key factor is whether or not the magnitude of the burden there is going to somehow shackle the chilling effect of making a phone call. We don't believe there is any chilling effect to replying. If the city decides we're going to take over full responsibility, and then what happens here, this is where the Dockery case does come into effect, and we agree with the city. Dockery case is on point. It states the law. The law says that absent some affirmative action of the city, they're going to be given immunity. We went through and gave you all the factual basis for that affirmative action. The court, in the court's ruling, cites Dockery and said the city committed some affirmative act, such as diverting plaintiffs to an unsafe area. That's what we're suggesting. When you've got all of these streets running into the closed state highway, because they had to close off the state highway, they left it open up until a few minutes before the parade. Wasn't that the purpose of the resolution, was to close the highway? Right, to close the highway and make sure that we did whatever traffic control was necessary when you closed the highway. And they got authority because they had to do, they had to have a resolution to close the highway. What about Dismint? Dismint? The Dismint case. The Dismint case, we believe is totally different in that we do have an affirmative action here on the closing of the east and west adjoining roads, 6th Street being the only street that was left open. Traffic was able to go on 6th Street until they finally closed Main Street. And that's when, it's like a funnel. They were taking all of the traffic from this whole section of town. They couldn't go across because they had been closed, funneling it into 6th Street. And then, unfortunately, about the time right before this crash, they put their finger over the end of the funnel and all the traffic has to stop because there's no place to go. It's the affirmative act that is different from Dismint, that they created. And unfortunately, and that's why we're not suggesting that they needed to go to the ICC and petition. That's no where in any of our claims that they need to petition the ICC. What is relevant about the ICC 1984 decision is what the railroad brought to us in the transcripts, that the city was warned. If you don't, if you do it this way, you're creating a trap. And to have a railroad crossing, I've sued railroads since the 1980s. I've never seen a crossing like this. There's 70 feet of no man's land. It's a longer area if you add all the way to the gates. Absolutely. And that no man's land is, it's like you're way back there, there was a sign, you went by, and the traffic's still edging up. And she gets caught on this track. And the other track is, like, if I'm down here, I can't tell what's on your bench. She's at the point where headlights are here. There's a stream of lights coming down Main Street this way, a stream of lights coming down this way. You can look out that side and you can't see right below your window because you're the driver. But if you look out this side, there's railroad tracks right here. And there's lights. And this is all on video. Part of the tragedy. Is this the video from the train? From the locomotive. And you can see what happens. She's there. And as the train gets closer, horns get louder. There are lights from both directions blinding you as to who's doing what. You can see she just gasses it and takes off and pulls right onto the other track where she would have. How fast was the train going? Do we know? About 50. And they were going 50. They had a policy. They called us and we flew down. And the railroad then, when we got in and started with the railroad, made it very obvious that instead of just calling us, this doesn't happen. And that is the burden we're trying. That's the only burden we're trying to place on the city. The relevance of these other claims is that they knew this was a trap. They were told in 1984 by the railroad who had experience in making these crossings, that's a trap. We can show that they should have known it was a trap because it violates the MUTCD. I have never in my career seen a railroad crossing where the north-south traffic gets gates and the east-west traffic going through over the railroad track doesn't have gates. They've got stop signs on 9th Street. So I don't know what would go through my mind if I came to that setting other than I know I'd never seen it. With that old group of the ICC? Yes, and that's why we know we can't claim that that is a basis for duty arising in this. We're not doing that. What we're saying is that should have given them notice that this is probably not the right intersection. If you're going to send people through, you should have sent them over the bridge down here. And their own public safety director, their own chief of police said, yeah, we know that's the most dangerous crossing in town. I mean, they knew that this is the bad crossing that they were sending all the traffic through. And when the traffic stopped, unfortunately, we were sitting there in that condition. What I've done is just real quickly gone through all of their claims of immunity. And under 412, under the police protection immunity, that pre-case on point. And we believe we've showed the affirmative acts. They both assume the duty of we'll do whatever we need for this line, but we don't have to do it. And then they funnel them into an area where they then stop the traffic. Unfortunately, and probably won't happen in another 50 years, that you stop traffic just as a time the train's coming through town that's not been warned. And I would suggest to this court that calling railroad is not a policy decision. They have said it was. And it's not a discretionary act that needs to be performed by somebody at a higher level. At the very best it could ever be is a ministerial act. They've got their own documents where they know from the training they've received they're supposed to call and let the railroad know. So we don't believe 201 has maybe even come close to meeting their burden. 203, 203, excuse me, failure to enforce any law. We're not suggesting there's a failure to enforce any law. We're only claiming that there is a resolution which isn't necessarily enforcement or non-enforcement of law. The resolution was the assumption of the duty. 2104, issuance of the permit. We're making no claim that they shouldn't have issued a permit. Our only claim is that once they issue the permit, that additional resolution that assumed the duty is where they then, they cut into their own immunity by their own choice. It wasn't something that we had asked them to do. There's no question. If they would have issued the permit and the Lions Club would have done this, the Lions Club would have liability for making the wrong decision of pushing people into the dangerous crossing. And then when the traffic stops, they're all in a parking lot. 2105 was the other failure to inspect. I don't understand the failure to inspect argument that they made. We're not claiming there was a failure to inspect. We do claim that the city owns that other spur track that comes all the way down. We're not arguing that what happened in front of the ICC was wrong. ICC is right. We can't argue it's wrong. We can't make a duty out of that. But what we do know is federal law says there's an agreement between the railroad and CSX, where allegedly CSX, you will take care of the maintenance. If that is to be recognized as a, because we don't, we don't govern the railroads, we don't regulate railroads, that's a federal responsibility. They have to qualify under 49 CFR 213 to show that they have gotten a waiver from the FRA that they are relieved of responsibility for that area of the track. And they don't have that waiver. We haven't seen it yet, but we believe they don't have it. The FRA doesn't have a copy of it. And the final immunity that they claim is 3104, and that's for signs and signage. Although this is a very unique crossing with, confusing to say the least, signs or signage, the only reason signs or signage are relevant is that it goes back to the knowledge of the city that this crossing has had the worst accident history. It's been their worst problem when they put two railroads meeting together in the middle of an intersection of two roads. All of the other crossings in town were changed so that that didn't happen. They didn't have this big trap in this big no man's land. This was the only one, and unfortunately it's the one where they directed the traffic through. If you have any further questions, I'd be happy to answer them. I can tell you we are not claiming that any crossing in the United States somewhere near some event would create liability. This is such a unique fact situation. We believe we should be allowed to go forward and at least get discovery done beyond that discovery that was limited to supplementing the complaint. Thank you. Mayor Bowman. I just want to make a few points. It's business about the Lions Club that he started off with. The city should have simply issued a permit and then all liability would have been on the Lions Club. He's suggesting that we abdicate our police responsibilities. We can't do that. We can't delegate our police functions to another entity. The Lions Club did not get out on immunity grounds. They got out on duty grounds. The immunities did not apply, as I recall. They're not a local public entity. They got out on other grounds if there was no duty. This notion of these affirmative acts, I have to talk about this a little bit. First of all, Section 4-102 does not have an affirmative act exception. Now, I'm not sure what the court was talking about in terms of that exception in the Dockery case. But I think what they were saying is, look, if you've got somebody, a police officer, who says, you sit right here next to where they're lighting off these fireworks or right on the line of fire or something else, maybe there's some exception. I don't see that anywhere in the statute itself. But this is not a situation where we've actively funneled anybody anywhere. We closed the parade route. There's no question about it. Is that going to cause congestion all over the place? Sure. There's 2,000 people coming to this thing that were at this particular event. It's been going on for 50 years. So, you know, it's an affirmative act for me to walk up here. All right? That's an affirmative act. It's an affirmative act for me to say, Justice Chapman, I'd like you to take a look at this view. Okay? You look at this view. It's an affirmative act also for me to push you off a cliff. Now, that latter one might subject me to some liability. But this notion that, and we addressed this very well in our reply brief. I started off in the reply brief with all these ways that the plaintiff is trying to fit this square peg into a round hole, and it doesn't fit. He adds this language, affirmative act, affirmative act, affirmative act, actively funneled, did this, did that. We closed the parade route. We passed a resolution that we had to pass because IDOC required that we pass it because we're closing a parade route. This Midland case that he talks about, we addressed that in our brief. That Midland parade was over a railroad crossing. It's completely different. It's not a situation where, so they actually had the parade form over the route when the train came. They're talking about what is exactly covered by Section 4-102 in this case, period. The ICC approved this. What they do is they go through their complaint and they nitpick little things. They find statements that were made during the ICC proceedings and say, oh, the railroad was concerned about this, but the city wanted the spur track to go there. Look, the bottom line is the ICC approved this. They approved this configuration. They approved where the legs are located. They approved the Conrail, now CSX, being responsible for maintenance of this entire area. That was all approved. So what he's saying is that they can go back and they can take little snippets from the proceedings and say, oh, the railroad wanted this, or the railroad wanted that, or the city was aware of this or was aware of that. But it was approved. So what he's saying is we're supposed to believe that what the ICC approved is dangerous. We should have done something about it. The bottom line, Your Honor, is this is a terrible tragedy. It's anybody's responsibility. It was the railroad that was responsible for maintaining this. He's stated all kinds of reasons why they allegedly settled, things that they said. Those aren't in the Second Amendment complaint. And so in terms of the other immunity provisions that he discussed, I don't think it's necessary to get into those, and I see that I'm about out of time. I didn't discuss them in my opening argument, and I do believe that they've been adequately and properly addressed, and I believe unless the question has any, unless the Court has any other questions, then I will conclude. Thank you, Counsel. The Court will take the matter under advisement and issue its decision in due course.